IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES R. DOWNES, #281824 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 2:15-cv-437-ECM |
| | ) | |
| CARTER DAVENPORT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

Plaintiff, James R. Downes ("Downes") is an inmate of the Alabama Department of Corrections ("ADOC"), housed at Easterling Correctional Facility ("Easterling") in Clio, Alabama, who brings this action under 42 U.S.C. § 1983, alleging constitutional violations in the handling of his mail at Easterling. The court adopted Recommendations to dismiss several of Downes's claims. Docs. 21, 106. The court referred back to the undersigned for further proceedings the question whether Downes is entitled to injunctive relief on his claim that he should receive hardback books. Doc. 106 at 3. "Should the Magistrate Judge find that the ban on hardcover books—if such a ban is in place—is unconstitutional, Downes may be entitled to prospective injunctive relief, and such a claim does not appear to be moot as a matter of law." *Id*.

Defendants filed supplemental special reports on the remaining question. Docs. 109, 113. Downes responded. Doc. 114. The court construes the special reports and supplemental special reports as a supplemental motion for summary judgment on Downes's First Amendment claim. Upon consideration of the motion, Downes's responses, and the evidentiary materials filed in

support and in opposition to the motion, the court concludes Defendants' supplemental motion for summary judgment is due to be denied.

## II. SUMMARY JUDGMENT STANDARD AND MATERIAL FACTS

The court set out the summary judgment standard for a pro se litigant more fully in its prior Recommendation. Doc. 104 at 2–4. Summary judgment is appropriate if, after viewing the evidence submitted in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018). "[A] material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

During the time relevant to Downes's complaint, he was an inmate at Easterling. It does not appear from the record that Downes was in segregation. Downes ordered a hardcover book, *Packing the Court*,[1] directly from Edward R. Hamilton Bookseller Company. Doc. 104 at 6. Downes states he needed it for his legal cases. *Id. Packing the Court* is available as a softbound book. Doc. 113–3. ADOC Administration Regulation 448, which governs inmate mail, provides that "publications should be received directly from the publisher or a recognized commercial distributor;" the regulation does not specifically forbid hardcover books. Doc. 26–1 at 8; Doc. 29–1 at 12; Doc. 104 at 7. Nevertheless, Defendant Sharon Blakely, the Mail Clerk at Easterling, avers that inmates cannot receive hardcover books because a "Warden banned incoming hardback books at Easterling Correctional Facility." Doc. 109–1 at 1 (Blakley Aff.). The "Orientation" manual at Easterling also informs inmates they cannot receive "[u]sed books from home" or "[h]ard back

---

[1] The full title is *Packing the Court: The Rise of Judicial Power and the Coming Crisis of the Supreme Court*. Doc. 113–3.

books (soft back only)." Doc. 113–4 at 7. "Any other items coming through the mail other than pictures, letters, cards, or stamps will need to be approved by a Captain or above." *Id.* at 8. Inmates may also request hygiene items through the chaplain. *Id.* According to Blakely, the book Downes ordered is in the mailroom at Easterling. Doc. 109–1 at 1.

Defendants offer a number of rationales for the ban on hardback books. Blakely avers "hardback books are considered to be a threat to the Institution's security; as they can be used as a weapon, to smuggle in contraband, and to hide weapons." Doc. 109–1 at 1. Walter Myers, a warden at Easterling, testifies by affidavit that hardback books can be used as weapons or to conceal contraband such as "guns/knives." Doc. 113–4 at 1. He explains:

> When struck hard enough with a hardback book, one could experience serious trauma or even death. Anything that can be used as a weapon is prohibited from being in an inmate's personal possession. Hardback books have arrived at Easterling and upon being searched the inside of the book had been cut out and replaced with drugs and cell phones. Drugs have also been found sealed inside the outside cover of hardback books.

*Id.* Myers does not state anyone at Easterling or another institution actually was attacked or injured with a hardback book. Myers does not identify what items inmates may have in their personal possession. Myers also does not state whether the altered hardback books he describes arrived directly from commercial distributors like Downes's book. Arnaldo Mercado, the ADOC Chief Law Enforcement Officer and Director of Investigations and Intelligence, testifies by affidavit that, based on his twenty-six years of law enforcement, including three years in his position with the ADOC, "hardcover books should not be allowed in a prison setting." Doc. 113–1 at 1. Mercado avers:

> Hardcover books can be utilized as weapons. Hardcover books have hard sharp edges that if utilized to strike a person could cause severe injury such as the loss of an eye. In addition, a hard strike with these type of books, could easily cause blunt

> force trauma to an individual. A strike to the head could cause serious brain injury. A strike to the trachea could cause serious and perhaps lethal injury to the victim.
> 
> Hardcover books can be utilized in the concealing of contraband. These books provide an easier and more reliable method of concealment than softcover books. A hardcover book provides a sturdier platform when cutting a recess area inside the book for such contraband, including, but not limited, to drugs, sharp edge weapons such as knives, and the possibly firearms. In addition the thicker shell could be tampered with to cut recesses in order to conceal illegal substances something that is impossible with a softcover book.
> 
> Hardcover books could, in addition, be utilized a[s] shields, lock jams, and the cover could be used to fashion handles for prison made weapons such as knives, commonly referred to as "shanks."

*Id.* at 1–2. Again, Mercado does not state inmates actually have used books as weapons at Easterling or anywhere else. To support their motion, Defendants also submit as evidence instructions from the internet entitled, "How to turn a boring old book into a stash box." Doc. 113–2. They do not state whether such books have arrived from commercial distributors, or whether it is likely they could, or whether inmates at Easterling have created "stash boxes" with books already in the institution. In their report, Defendants also refer to an online self-defense video that "points out how the edge of the hardback is an effective weapon for a strike to the throat, and that the hard corners can be used to strike a person's eyes." Doc. 113 at 4. *See* "Use a Book as an Improvised Weapon," https://www.youtube.com/watch?v=y2JtP0a-tSI (last visited Aug. 14, 2018). Defendants do not state whether inmates have access to this video or whether inmates at Easterling or any other institution have used books as shown in the video.

Downes responds that inmates in prison who wish to attack others have access to "baseball bats from the softball field, or even one of the wooden broom or mop handles, or maybe the steel spikes from the horse shoe pit, or . . . steel weights and bars from the free weight pile on the yard, not to mention the steel homemade shanks that are all over this prison . . . ." Doc. 114 at 1–2. Downes also states "we can tear the cover off but they will not allow this . . . ." Doc. 4 at 5.

### III. DISCUSSION

Downes's book sits in the mail room, but he cannot receive it because prison officials ban all incoming hardcover books regardless of their source. It is Downes's burden to show the prison regulation impinging on his First Amendment rights is not reasonably related to legitimate penological interests. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (burden of proof is on the inmate); *see Turner v. Safley*, 482 U.S. 78, 89 (1987) ("when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests"). To determine whether the prison's ban on all hardcover books, and *Packing the Courts*, in particular, is "reasonably related to legitimate penological interests," the court considers four factors from *Turner*, giving substantial deference to prison authorities "who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132 (citations omitted); *see also Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 967 (11th Cir. 2018) (rejecting argument to give diminished deference to prison officials under *Turner*). The four *Turner* factors include: (1) whether there is "a valid, rational connection between the prison regulation and a legitimate governmental interest;" (2) "whether there are alternative means of exercising the right;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, on the allocation of prison resources;" and (4) "the existence of obvious, easy alternatives[, which] may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Perry v. Sec'y, Fla. Dep't of Corr.*, 664 F.3d 1359, 1364–65 (11th Cir. 2011) (quoting *Turner*, 482 U.S. at 89–90) (alteration added in *Perry*). On balance, the court concludes a genuine dispute of material fact exists on the question whether the

Easterling regulation banning hardcover books from known book distributors is reasonably related to legitimate penological interests.

### A. First *Turner* Factor: Existence of a Rational Connection

The first factor requires the prison official to show there is a "rational connection" between the regulation banning all hardcover books regardless of their source and its interests in prison security and safety. *Turner*, 482 U.S. at 89; *see also Prison Legal News*, 890 F.3d at 967–68. "The *Turner* standard does not require the Department to present evidence of an actual security breach to satisfy the first factor." *Prison Legal News*, 890 F.3d at 968; *see id.* (prison need not present "specific evidence of a causal link between [a prison policy] and actual incidents of violence (or some other actual threat to security)" (quoting *Lawson v. Singletary*, 85 F.3d 502, 513 n.15 (11th Cir. 1996)) (alteration added in *Prison Legal News*); *see id.* (citing cases from the Seventh, Eighth, and Ninth Circuits that do not require past evidence to approve future security measures). Instead, the deferential standard recognizes that prison officials must be allowed "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Turner*, 482 U.S. at 89; *see also Prison Legal News*, 890 F.3d at 968 (quoting *Turner*, 482 U.S. at 89). Although the court must give "wide-ranging deference [to prison administrators] in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *Lawson*, 85 F.3d at 510 (quotation marks and citations omitted), the prison must "show more than a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006). A regulation does not meet the first *Turner* standard if "the logical connection between the regulation and asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90.

The Court of Appeals' decision in *Daker v. Warren*, 660 F. App'x 737 (11th Cir. 2016) (per curiam), is instructive on the first factor. In *Daker*, a county jail banned all hardcover books, including those sent directly from publishers and established booksellers. *Id.* at 739, 744. On the question whether there was a reasonable basis to believe that allowing hardcover books increased violence at the jail, the Court of Appeals criticized the lack of evidence offered to support the ban, namely the sheriff's two conclusory sentences that hardcover books were banned "because of security concerns" and because hardcover books could "be used as weapons and as a means of transporting contraband items." *Id*. at 744. The sheriff did not explain why hardcover books sent directly from a publisher or established bookseller posed a danger of hidden contraband. *Id.* The court observed that the jail allowed softcover books from those same sources, that the record did not suggest softcover books could not also be similarly altered as hardcover books, or that officials could not search hardcover books just as they searched softcover books, or why such searches would be unreasonable. *Id*. at 744–45. Addressing the rationale that hardcover books could be used as weapons, the circuit pointed out there was no evidence books actually had been used as weapons, and inmates "already have access to a multitude of things that can be used as weapons (e.g., razors, brooms, mops, hard plastic trays, bars of soap, shoes, hard plastic scrub brushes) but are not banned." *Id.* at 745. It added that factual assertions in the appellate brief but not in evidence "are not substitutes for evidence that should have been presented to the district court." *Id.* The court approved of its dicta in an older case that a claimed fear of weapons and contraband is not enough to justify a complete ban on hardcover books when "common household items" like forks can be used as a weapon and officials can examine reading materials to detect contraband. *Id*. (quoting *Cruz v. Hauck*, 475 F.2d 475, 477 (5th Cir. 1973)). It also approved of a seventh circuit case where officers raised the same concerns about weapons and contraband, and the seventh

circuit rejected the complete ban because officers could limit hardcover books to those sent from publishers or tear off the hardcover. *Id*. (citing *Jackson v. Elrod*, 881 F.2d 441, 444–46 (7th Cir. 1989)). It distinguished a third circuit case involving a banned hardcover Koran because the inmate was in segregation, there were "more detailed affidavits concerning the danger posed" and the inmate was able to practice his religion without the book. *Id*. at 746 (citing *Pressley v. Beard*, 266 F. App'x 216, 218–19 (3d Cir. 2008)); *see Pressley*, 266 F. App'x at 219 (affidavit stated "hardbound book could be disassembled to make a weapon"). The court in *Daker* emphasized it was not ruling the ban on hardcover books was unconstitutional as applied, but rather that summary judgment was not warranted. *Daker*, 660 F. App'x at 746. It noted that, if officials submitted sufficient evidence on the first *Turner* factor to show a logical connection between the ban and security concerns, then the court should address the remaining *Turner* factors. *Id*. n.3.

Here, unlike in *Daker*, prison officials have submitted affidavits and a video identifying particular ways a book could be used as a weapon. If there was an implication in *Daker* that prison officials need to connect a regulation to a past security breach, the decision in *Prison Legal News* makes clear that no such evidence is required. *Compare Daker*, 660 F. App'x at 745 ("there was no evidence that such books had in fact been used as weapons") *with Prison Legal News*, 890 F.3d at 968 ("We have rejected the 'misconception' that prison officials are 'required to adduce specific evidence of a causal link between [a prison policy] and actual incidents of violence (or some other actual threat to security).'" (citation omitted). Nevertheless, as in *Daker*, Defendants here present no reason why books arriving from established booksellers pose the same concern about introducing contraband as do books arriving from private individuals. Similarly, the "fear of weapons" rationale is less connected to the goal of security when there is no evidence the prison also bans inmate access to other items that could be used as weapons, such as baseball bats, broom

8

handles, or hygiene items. *See Daker*, 660 F. App'x at 745; *cf. Jackson v. Elrod*, 671 F. Supp. 1508, 1511 (N.D. Ill. 1987) (prison official in effect admitted "hardcover books pose no greater security risk than many other items that detainees may receive in the mail and may keep in their cells"), *aff'd*, 881 F.2d at 441; *but cf. Davis v. Simons*, No. 2:15cv175, 2015 WL 13064943, at *4 (E.D. Va. Nov. 13, 2015) (approving hardcover book ban "because they have been used as weapons and shields in the past" and "because they can be used to smuggle contraband"), *aff'd*, 667 F. App'x 50 (4th Cir.), *cert. denied*, 137 S. Ct. 517 (2016). Furthermore, Downes apparently was not in segregation, as was the prisoner in *Pressley*, where security concerns are understandably greater. *Pressley*, 266 F. App'x at 218–19. And while the connection between the ban on hardcover books at Easterling and prison security might not be "so remote as to render the policy arbitrary or irrational," *Turner*, 482 U.S. at 89–90, the first *Turner* factor in Downes's case is not dispositive of the question whether the Easterling regulation is reasonably related to a legitimate penological goal. *Cf. Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001) ("If the connection between the regulation and the asserted goal is 'arbitrary and irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor.") (quoting *Turner*, 482 U.S. at 89); *see also Freeman v. Texas Department of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004) (interpreting the decision in *Turner* as stating that a court need not weigh evenly or even consider each of the factors because rationality is the controlling standard). The court now turns to those remaining factors.

### B. Second *Turner* Factor: Alternative Means

Defendants in their most recent report point out that *Packing the Courts* is also sold as a paperback. Such evidence is helpful in determining that Downes has alternative means to read *Packing the Courts*. But Downes's claim encompasses the total ban on all hardback books with no exceptions. Doc. 106 at 3. Moreover, other courts that approved general bans on hardcover books

have done so when inmates had other alternative means to access the books. For example, a court in Wyoming approved a ban on hardcover books in cells when inmates could buy softbound books, or could rebind hardcover books as softbound, or could read the hardcover books in the prison library. *See Pfeil v. Lampert,* 11 F. Supp. 3d 1099, 1112 (D. Wyo. 2014), *aff'd,* 603 F. App'x 665 (10th Cir. 2015). In Texas, a court approved a ban on hardcover religious books when a softcover alternative was available. *Shelton v. El Paso Cty.*, No. EP-08-CV-26, 2010 WL 3503511, at *7 (W.D. Tex. Sept. 1, 2010); *see id.* (citing *Leachman v. Thomas*, 229 F.3d 1148 (5th Cir. 2000) (per curiam) (unpublished) (approving ban on hardcover books where institution included exception for certain correspondence classes and religious materials available only as hardbacks). Here, Downes has no alternative means to read books that are available only in hardcover.

### C. Third *Turner* Factor: Impact of Accommodating the Right

Defendants present virtually no evidence of what impact, if any, it would have on prison resources to search incoming hardcover books for contraband compared to what already is done for paperback books. As for allowing inmates to have hardcover books in their cells, there is only counsel's statement in the brief that removing hardcovers would tax already taxed security resources. Doc. 113 at 5; *see Daker,* 660 F. App'x at 745 (counsel's statements do not substitute for evidence). The individual Defendants do not address Downes's suggestion to remove hard covers, or what impact accommodating Downes's right would have on prison resources, or whether Defendants considered alternative ways for Downes to get the information, such as making the books available in the library. Defendants also do not explain if or how accommodating Downes's request for hardcover books might have "a significant 'ripple effect' on fellow inmates or on prison staff," which would require the court to be "particularly deferential to the informed

10

discretion of corrections officials." *See Turner*, 482 U.S. at 90. Consequently, the court concludes the third factor weighs in Downes's favor.

### D. Fourth *Turner* Factor: Exaggerated Response

Likewise, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* Defendants rely on their same argument that paperback books provide a ready alternative to hardback books. Doc. 113 at 5. Not every book is available as a paperback. Moreover, the record does not suggest that searching hardback books received directly from publishers, or removing book covers, or making hardcover books available in the library are more than a de minimis cost to valid penological interests. Prison officials at Easterling certainly have discretion to run the facility in ways that they deem best address safety and security needs. *See Prison Legal News*, 890 F.3d at 974–75 (recognizing different institutional structures and inmate populations call for different safety and security precautions, and the Constitution does not require all institutions to follow a practice just because it is allowed at one institution). Based on this record, however, there appear to be "ready alternatives" to the total ban on hardback books and on *Packing the Court* despite its availability as a paperback. The fourth *Turner* factor therefore does not weigh in Defendants' favor.

After weighing the four *Turner* factors, the court concludes there remains a genuine dispute whether Defendants' total ban on hardcover books, and on *Packing the Court*, in particular, is reasonably related to legitimate penological interests. *See Turner*, 482 U.S. at 89. Consequently, Defendants' supplemental motion for summary judgment is due to be denied.

### IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. Defendants' supplemental motion for summary judgment be DENIED.

2. This case be referred for an evidentiary hearing on Downes's claim for injunctive relief.

It is further

ORDERED that on or before August 31, 2018, the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a de novo determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

Dated this 15th day of August, 2018.

    /s/Terry F. Moorer
    TERRY F. MOORER
    UNITED STATES MAGISTRATE JUDGE