IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JAMES R. DOWNES, ) | |
| ) | |
|    Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACT. NO.  2:15-cv-437-ECM |
| ) | (WO) |
| CARTER DAVENPORT, *et al*., ) | |
| ) | |
|    Defendants. ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.      INTRODUCTION**

Now pending before the Court is the Plaintiff's request for declaratory and injunctive relief. (Doc. 1, Doc. 4, Doc. 17, and Doc. 141).[1]

The Plaintiff, James R. Downes ("Downes'), is proceeding *pro se* in this case. After the initial *pro se* complaint was filed, the case was referred to a Magistrate Judge for Recommendation. On January 25, 2018, the Magistrate Judge recommended that the Defendants' motion for summary judgment be granted, but upon review of the objections to the Recommendation, another judge of this court entered an Order adopting the Recommendation in part but declining to grant summary judgment as to Downes' 42 U.S.C. § 1983 claim for violation of his First Amendment rights. Specifically, the court concluded that Downes' claim was not moot because it was not clear from the record that

---

[1] After this case was set for an evidentiary hearing, the Plaintiff filed a Motion for Injunctive Relief. (Doc. 141).  The Court consolidated the hearing on the motion with the trial on the merits. FED. R. CIV. P. 65. The substance of the Plaintiff's requested relief has been considered as evidence relating to the presence of hardback books in the prison and not as evidence of removal of the books from areas in the prison, which is not the basis of any claim before this Court.

a book Downes had been denied access to had been destroyed and that, even if the book was "lost, his complaint, liberally construed, requests that incoming mail, including hardcover books, be delivered to him." (Doc. 106 at 3). The court again referred the case to the Magistrate Judge on a claim for injunctive relief, and for a determination by the Magistrate Judge as to whether "the ban on hardcover books—if such a ban is in place—is unconstitutional . . . ." (*Id.*).

The case was then reassigned to the undersigned. This Court adopted a Recommendation by the Magistrate Judge, denied summary judgment to the Defendants, and set the case for an evidentiary hearing so that the factors applicable to the First Amendment claim could be applied appropriately. (Doc. 133).

Due to restrictions posed by the COVID-19 pandemic, the Plaintiff testified and questioned witnesses by video teleconference during the evidentiary hearing held on October 27, 2020.

Based on the entire record, including the evidence presented at the evidentiary hearing, the Court makes the following findings of fact and conclusions of law.

## II.   FACTS

The Plaintiff, Downes, is an inmate of Easterling Correctional Facility ("Easterling"). The claim heard at the evidentiary hearing arises from his having been denied access to a book he ordered: *Packing the Court*. Downes ordered the book directly from Edward R. Hamilton Bookseller Company but was not allowed to receive it because the book which arrived at the prison was bound in hardback. *Packing the Court* also is

2

available as a soft cover book. (Doc. 113–3). Downes has never received the hardback or soft cover version of *Packing the Court*. No testimony was presented as to the current location of the hardback copy of the book.[2] Downes testified at the evidentiary hearing that he was denied access to the information within the book at the time of his direct criminal appeal, but since that time has found the cases he had hoped to read about in the *Georgetown Law Journal* and other legal books, and he has used that information in filing a petition in federal court. Downes presented no evidence at the evidentiary hearing of any other hardback book that he has ordered and been denied access to by Easterling officials.

Easterling, consistent with the policy of other prisons in Alabama, restricts inmate access to hardback books. The regulations which govern inmate mail, Standard Operating Procedure 448-01 and 448-02, do not specifically ban hardcover books, but witnesses including Warden John Crow ("Crow") and Sharon Blakely ("Blakely"), the Mail Clerk at Easterling, testified that inmates cannot receive hardcover books in the mail. Blakely testified that if a hardback book is received in the mailroom, the inmates have 30 days to return the book or send it home at their own expense.

The orientation packet signed by Downes states

> You CANNOT receive the following:
> *Used books from home
> *Hard back books (soft back only)
> *Explicit pornographic material such as pictures or magazines.

---

[2] During the summary judgment stage of this case, the court noted conflicting evidence as to whether Downes' book was still located in the mailroom at Easterling. (Doc. 106 at 3).

3

(Doc. 113-4 at 7).

During the evidentiary hearing, the following stipulations, as set out by Downes (doc. 157) and agreed to with slight modifications by the Defendants (doc. 160), were read into the record by counsel for the Defendants:

1. The State agrees that Easterling Correctional Facility has and does now have in their possession hard cover books, and has had them for the past several years. Located in these libraries:
   A. Faith Dorm AKA H1 and H2 several hundred
   B. The Honor Dorm AKA E-1 had about 70 "removed"
   C. The law library controlled by Officer Wagner "removed"
   D. The chapel under direction of Chaplin Askew "80 +"
   E. Wallace Community College in excess of 400 books.
   (According to workers the "removed" books have been taken to Admin and possibly no longer on the property.)

2. As far as known, Easterling Prison has not had any hard cover books from distributors and book sellers, such as Books-A-Million, Amazon, Bargain Books, Books N Stuff in the past several years that had drugs or cell phones hidden in them.

3. Hard cover books have been removed from the Honor Dorm and the law library . . . some have been brought to Admin. Office.

4. No incoming hard cover books have been allowed in the mail room, to go to inmates, as per the 448 or the 448-01; nor have inmates been allowed to have the covers removed.

5. According to document 113-4 at 1, and Doc. 122-1 page 3 this quote from Warden Walter Myers on an affidavit to the court states: "Hardback books have arrived at Easterling and upon being searched the inside of the book has been cut out and replaced with drugs and cell phones. Drugs have

4

> also been found sealed inside the outside cover of hardback books." (Quote from Warden Myers).

Although it is stipulated that hardback books are located in the prison, no evidence was presented as to how they came to be present in the dorms.[3]

Crow testified that he does not allow hardback books in general population areas of the prisons he has worked in, and that when, as a warden new to Easterling, he discovered that hardback books were located in the E and H dorms at Easterling, he ordered those books removed. He testified that the policy is to have only controlled access to hardback books. He explained that hardback books are not allowed in the prison except in the law library or in trade schools. Assistant Deputy Commissioner of Operations for the Alabama Department of Corrections Cheryl Price ("Price") testified that the hardback books the prisons have are in law libraries, but those books are minimal because libraries now utilize computers.

Easterling imposes hardback book restrictions because of a security interest. Violence is an issue in Alabama's prisons.[4] It was undisputed at the evidentiary hearing that there had recently been a homicide at Easterling which was accomplished with a handmade knife. Crow also testified that there were four incidents involving weapons

---

[3] Downes stated during his opening statement, before he was placed under oath, that most of the books in the dorms were donated by inmates and some were donated by outside organizations. Because this was not part of his sworn testimony, the Court does not consider this as evidence.

[4] The Court takes judicial notice of the April 2, 2019 Notice Regarding Investigation of Alabama's State Prisons for Men by the United States Department of Justice which states that there is reasonable cause to believe that Alabama prisons fail to protect inmates from violence. https://www.justice.gov/opa/pr/justice-department-alleges-conditions-alabama-mens-prisons-violate-constitution.

since that homicide. Crow further testified that drugs within the prison lead to trafficking and violence. Drugs and weapons can be concealed in both hardback and soft cover books. Crow credibly testified based on his experience, however, and the Court finds as fact based on that testimony, that it is easier to hide contraband in hardback books than in soft cover books. Crow testified to a specific instance at a different prison of a hardback book which had been hollowed out and had drugs within it as well as a knife concealed in the binding. Deputy Commissioner Charles Williams testified to a specific instance in which hardback books were used for protective gear to facilitate escape over razor wire. Williams also testified that hardback books are more effective tools when inmates resist lawful use of force by prison officials. Crow testified that he is personally aware of books arriving at a prison which were purported to be from publishers from which drugs were confiscated upon arrival at the prison. As noted above in the statement of stipulated facts, a previous warden, Walter Myers, offered a similar observation regarding Easterling. The stipulated facts clarify that Easterling has not had any hard cover books from distributors that had drugs or cell phones hidden in them in the last several years.

Inmates at Easterling have access to alternatives to hardback books. It is undisputed that inmates can receive soft cover books through the mail. When asked whether there is a mechanism in place whereby an inmate may get access to the information within a hardback book, Price credibly explained that there are cooperative efforts made for getting soft cover versions of books, but if there is a legal matter, an inmate can make a request through the legal division, and then the prison would actually copy the information they

6

needed from the book. Price and Associate Commissioner Steve Watson further testified that prisons will have Prisoner Education Devices ("PEDs"), which are handheld electronic readers, in the future to give inmates access to 50,000 digitized books. The technology is not yet present in Easterling, however, and the Court does not find it to be an alternative for the inmates at present.

Access to hardback books also is restricted at Easterling because the facility lacks sufficient staffing to reduce the security risk posed by hardback books. Crow testified that there are 1,318 inmates at Easterling and that the facility is at 30% staffing capacity. Crow explained that with the inadequate staffing levels he has, every day the staff is already behind on basic tasks such as timely feeding and getting medicine to the inmates. Crow offered the opinion based on his experience, which the Court accepts, that it takes more time to search a hardback book than a soft cover book because items can be concealed in the binding and soft cover books can be bent. Price also testified that the prison does not have the staffing necessary for the additional time it takes to search hardcover books or to remove the covers from those books. Blakely's testimony was that in her experience, because you can move a soft cover book more, it is easier to search. Blakely also testified that it is difficult to take the covers off hard back books.

### III.   CONCLUSIONS OF LAW

A.  First Amendment Claim Based on Denial of Access to *Packing the Court*

The Defendants have argued that the Plaintiff's First Amendment rights have not been impinged because he was free to read *Packing the Court* in a soft cover version and

that his request for injunctive relief is moot because it is undisputed that he now has the information he sought to obtain from *Packing the Court*.

While the information contained within the book has been obtained by Downes, the book itself has not been, and no evidence was presented at the evidentiary hearing to establish the location of the copy Downes ordered and was denied access to by the prison. Therefore, the Court cannot conclude that his claim is moot, but will consider the fact that Downes now has obtained access to the cases discussed within *Packing the Court* as a part of the analysis of Downes' claim for violation of his First Amendment right.

Prison regulations that impinge on an inmate's First Amendment rights must be content neutral and reasonably related to legitimate penological interests. *Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 967 (11th Cir. 2018). In making that determination, courts balance the four factors set out in *Turner v. Safley*, 482 U.S. 78, 89-90 (1987), which are (1) whether the regulation has a valid, rational connection to a legitimate governmental interest; (2) whether there are alternative means open to inmates to exercise the asserted right; (3) what impact an accommodation of the right would have on guards and inmates and prison resources; and (4) whether there are ready alternatives to the regulation. If, in analyzing the first factor, a court concludes that the connection between the regulation and the asserted goal is "'arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor." *Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001).

The first *Turner* factor does not require evidence of an actual security breach. *Prison Legal News*, 890 F.3d at 968.  A regulation will be upheld where it is not "so remote'' from security and safety interests as to render the ban "arbitrary or irrational." *Id.* at 972.  *Turner* does require prison authorities to show more than a formalistic logical connection between a regulation and a penological objective. *Prison Legal News*, 890 at 965 (citing *Beard v. Banks*, 548 U.S. 521, 535 (2006)).

In this case, there is more than a formalistic logical connection between the prison's policy and the stated penological objective of security.  As set forth above, the testimony of several prison officials at the evidentiary hearing established that there have been specific instances at Easterling and other prison facilities of hardback books being used to conceal weapons, to facilitate escape, to resist lawful force by prison officials, and to conceal drugs. *See also Bell v. Wolfish*, 441 U.S. 520 (1979)(acknowledging that drugs and weapons can be secreted in the bindings of hardback books and that the books are difficult to search effectively).  Although Downes appears to argue that there is no rational connection between security and a ban on books shipped directly from publishers, Crow testified that he is aware of books arriving at a prison which were purported to be from publishers from which drugs were confiscated upon arrival at the prison. Upon consideration of the applicable law and the record, this Court concludes that the Defendants' restriction of the hardback book *Packing the Court* is not so remote from security interests as to render the ban arbitrary or irrational.  *See Whitehead v. Mgmt. & Training Corp.*, 2020 WL 5645814, at *8 (D.N.M. 2020) (finding defendants' restrictions

9

on hardbound books—including books received directly from publishers, vendors, and book clubs—are rationally related to their legitimate, neutral penological purpose based in part on testimony that a book that appeared to be from a publisher could be used to conceal contraband).

With respect to the second *Turner* factor, prisons do not have to provide "exact, one-for-one substitutes to provide alternative means." *Prison Legal News*, 890 F.3d at 972. The book in question in this case is available in soft cover, so Downes had an alternative method to exercise his First Amendment right. *See Skelton v. Pri-Cor, Inc*., 963 F.2d 100, 103 (6th Cir. 1991)(applying second *Turner* factor and reasoning that although the plaintiff was not allowed to have the hardcover Bible, he would have been allowed to have a softcover Bible); *see also Leachman v. Thomas*, 229 F.3d 1148 at *4 (5th Cir. 2000) (unpublished) ("[T]he purchase of softbound books in lieu of hardbound books is certainly a reasonable alternative means of exercising prisoners' rights."). Furthermore, as noted, it is undisputed that Downes now has access to the cases discussed within *Packing the Court. See Whitehead*, 2020 WL 5645814, at *10 (finding it significant that there was no dispute that defendants offered plaintiff inmate alternative means to access the information he claims was only available in hardbound books). This Court concludes, therefore, that the second *Turner* factor weighs strongly in the Defendants' favor.

The third *Turner* factor concerns the impact that "accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. This factor will weigh in favor of prison

officials if accommodating the right has "a significant ripple effect" on staff and other inmates. *Id.* Hardback books must be searched by prison officials, requiring an allocation of staff for that task. *See Prison Legal News*, 890 F.3d at 973 ("It follows that if the Department admits an issue of the magazine, it would have to allocate more time, money, and personnel in an attempt to detect and prevent security problems engendered by the ads in the magazines."). Staffing would also have to be allocated to remove book covers, if the prison were to engage in the mitigation of harm which Downes has suggested of removing book covers. Prison officials testified that searching hardback books and removing the covers of hardback books requires staffing that is not available at a facility that is at 30% of the staffing level it should have. "Where, as here, the right in question can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike, . . . the courts should defer to the informed discretion of corrections officials." *Thornburgh v. Abbott*, 490 U.S. 401, 418 (1989) (internal quotations omitted). This factor weighs in favor of the Defendants.

The fourth *Turner* factor requires a consideration of whether the restriction of the hardback book *Packing the Court* is "an exaggerated response to prison concerns." *Prison Legal News,* 890 F.3d at 974. "*Turner* does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." *Overton v. Bazzetta*, 539 U.S. 126, 136 (2003). Downes elicited testimony to show that soft cover books also present security risks, but that the

11

prison allows those and simply searches those books on arrival. Credible testimony at the evidentiary hearing, however, established that hardback books are harder to search, requiring more staff time. Downes also suggested that the book covers could be removed by staff, but the testimony regarding the lack of sufficient staffing demonstrates that this accommodation of Downes' right would not be at *de minimus* cost to valid penological interests. The Court cannot conclude that this factor weighs in favor of Downes.

Considering the record and the evidence before it, and weighing the *Turner* factors, the Court concludes that Downes is not entitled to relief on his First Amendment claim based on denial of access to his hardback copy of *Packing the Court*. *See Shelton v. El Paso Cty.*, 2010 WL 3503511, at *7 (W.D. Tex. 2010)(denying claim challenging a hardback book ban where there was insufficient evidence to suggest that the Quran is not available in a soft-cover format or that the plaintiff attempted and was unable to obtain a soft-cover Quran directly from a publisher or bookstore with his own resources or with the help of family or friends).

B. First Amendment Claim Based on Broader Hardback Book Restriction

As noted, at earlier points in this litigation, the allegation of Downes' claim has been liberally construed to cover more than his claim that he was denied access to a hardback version of *Packing the Court*, and to include a claim that he was denied access to other hardback books which he sought to receive through the mail but could not because of a hardback book ban. (Doc. 106 at 3).

Although given the opportunity through multiple court filings, stipulated facts, and an evidentiary hearing on his First Amendment claim, Downes has presented no evidence that he has ordered any hardback book, other than *Packing the Court,* to which he has been or will be denied access. *Cf. Daker v. Warren,* 660 F. App'x 737, 743–44 (11th Cir. 2016)(noting evidence in the record that some of the books the plaintiff "wished to receive were available in hardcover format only"). The claim before the Court is a request for injunctive and declaratory relief, which requires proof of "real and immediate—as opposed to a merely hypothetical or conjectural—threat of future injury." *Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014). This is not a case in which the "involuntary nature" of the status of the Plaintiff means that he "cannot avoid exposure to the challenged course of conduct." *Church v. City of Huntsville*, 30 F.3d 1332, 1338 (11th Cir. 1994) (internal quotation omitted). To the contrary, the challenged conduct is denial of access to a hardcover book which can occur only after Downes voluntarily orders a book. In the absence of any evidence regarding hardback books other than *Packing the Court*, Downes has not presented evidence to demonstrate that "he faces a substantial likelihood of injury in the future." *Wooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1284 (11th Cir. 2001). His claim for equitable and declaratory relief is due to denied on that basis.

Even if Downes could proceed on this claim, however, factors one, three, and four of the *Turner* test weigh against him as to this broader claim, for the reasons discussed above. As to *Turner* factor two, the only evidence before the Court regarding Downes'

attempt to exercise his First Amendment right is that he sought information to help him with his criminal appeal.[5] Even assuming that there are legal materials that are only available in hardback, Price established at the evidentiary hearing that information can be obtained through the legal division of the prison if the information is located only in hardback legal books. The evidence before the Court, therefore, is that Downes has an alternative to access information located within hardback legal books, so that the second *Turner* factor also weighs against him as to this claim. Therefore, the Court alternatively concludes that Downes is not entitled to declaratory or injunctive relief on the merits of a First Amendment claim based on denial of access to hardback books other than *Packing the Court*.

Accordingly, for the reasons stated, it is hereby ORDERED as follows:

1. The Plaintiff's request for declaratory and injunctive relief is DENIED.

2. The Motion for a Preliminary Injunction (Doc. 141) is DENIED as moot.

A separate Judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.

DONE this 6th day of November, 2020.

                                                /s/ Emily C. Marks
                                                EMILY C. MARKS
                                                CHIEF UNITED STATES DISTRICT JUDGE

---

[5] Although the Court does not consider it as evidence in the case, the Court notes that a June 19, 2015 pleading characterized the sources Downes was seeking as legal, alleging that he has "at least one legal book that was not allowed due to the book being 'hard cover.'" (Doc. 4 at 4).

14